

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-18-00243-CV

———————————————

IN THE INTEREST OF S.P., A.P., A.P., AND J.P., CHILDREN

On Appeal from the 97th District Court
Montague County, Texas
Trial Court No. 2015-0340M-CV

Before Gabriel, Pittman, and Birdwell, JJ.
Memorandum Opinion by Justice Birdwell

# MEMORANDUM OPINION

Appellant A.P. (Father) appeals the trial court's order terminating his parental rights to his children S.P. (Sarah), A.P. (Adrianna), A.P. (Andrew), and J.P (Jackson).[1] In one issue, he argues that the evidence is legally and factually insufficient to prove that termination is in the children's best interest. We affirm.

## Background

**Mother and Father's relationship, and Sarah's and Adrianna's births**

Father moved from California to Texas in 2005, when he was in his early twenties. Upon his arrival, he held various jobs and lived with his parents in Lavon. At one of his jobs, in 2009, he met J.P. (Mother). They began dating and eventually moved in together at a house in Farmersville. After a few months of living together, they got married. According to Father, Mother was not a good housekeeper; he "picked up everything when [he] was there."

Father and Mother conceived Sarah, and Mother gave birth to her in January 2011. They then conceived Adrianna, and she was born in April 2013. Before Adrianna's birth, Mother and Father both worked and divided the responsibility of caring for Sarah, but according to Father, he was Sarah's primary caretaker. Sometime

---

[1]To protect the children's privacy, we use aliases for them and for related persons throughout this opinion. *See* Tex. Fam. Code Ann. § 109.002(d) (West Supp. 2018); Tex. R. App. P. 9.8(b)(2).

after Adrianna's birth, Father and Mother agreed that Mother would stay home to be the children's primary caretaker while Father worked to provide for the family.

**2013 CPS intervention, Andrew's and Jackson's births, and events in the summer of 2015**

Father obtained a job in the oil field, which required him to stay away from home for significant periods of time. In 2013, when Adrianna was less than a year old and Father was away from home, Child Protective Services (CPS) contacted Mother. According to Father, Mother had taken Adrianna to a doctor when she was sick, and when she had not followed up with the doctor as the doctor had requested, the doctor had called CPS. Mother told Father that she "just didn't remember" to take Adrianna back to the doctor, and Father "got upset and started yelling at her." When CPS investigated, it found that the children's home was cluttered; according to Father, there were "toys [all] around, and there was bags of . . . chips [and] like, you know, crumbs." T.P. (Grandmother), Father's mother, had visited the Farmersville home and had noticed that it was "usually cluttered"; she later testified that Mother "wasn't the best housekeeper."

A doctor diagnosed Adrianna, who was underweight, with failure to thrive. Father later testified that Mother had told him that Adrianna's diagnosis was incorrect; he also averred that when CPS investigated, it had found only "dust bunnies on [an] air filter, and that was the extent of it." When CPS became involved with the

3

children because of Adrianna's condition, Grandmother kept them at her house for a short time.

Father got a new oil-field job that allowed him to take more time off and to visit home more frequently. Because Mother believed that part of the clutter had resulted from a too-small house, she and the children moved to a larger house in Farmersville. When Father came home to the new house for two weeks at a time, he helped Mother clean it.

Upon Andrew's birth in April 2014, Father stayed at home for an extended time and helped Mother cook and clean. Later in 2014, the family moved to a house in Bowie, which was closer to Father's job. Soon thereafter, because of economic conditions in the oil and gas industry, Father lost his job. He got another full-time job, but the job did not pay as much as his prior job, and his father began giving him money to pay expenses. He then lost his job again, and his parents and brother helped him pay more expenses. When Mother and Father were living in Bowie, Father's parents paid their rent two times and helped them pay electric bills on a couple of occasions. Grandmother visited Mother and Father at their home in Bowie when they moved into it, and she did not visit them there again.

Mother gave birth to Jackson in June 2015. Records from her hospital stay recite that she had a hydrocodone dependency and that the hospital monitored Jackson for signs of withdrawal. Shortly after Jackson's birth, Father got a job working on boilers in Nevada, Texas. He began living with his sister and his brother-

in-law in Nevada while Mother and the children stayed in Bowie. Around that time, using a government-assistance card, Father bought a large amount of groceries that Mother could keep in the Bowie house and use while he was gone.

According to Father, near the end of July 2015, he saw the children when they visited the Nevada house for a birthday celebration. Father testified that when he saw Jackson at that point, Jackson looked like he was being fed, and no one at the birthday celebration voiced any concerns about the children's well-being. Grandmother attended Father's birthday party. At the party, according to Grandmother, Jackson appeared to be in good health; he did not appear underweight, and he was in good spirits. To her, the other children also appeared to be happy, and Grandmother did not notice anything abnormal.

Father visited the Bowie house on the night of September 10, 2015.[2] According to his initial testimony before an associate judge, he went there to see Mother and the kids because his employer was planning to send him to work in Louisiana. According to that testimony, when he arrived at the house, he went inside it; kissed the children, who were asleep; and did not notice anything amiss—the floor was generally clean, and the house smelled like Pine-Sol. According to this initial testimony, Father's visit to the Bowie house was the last time he saw the house or the children before their

---

[2]According to his initial testimony at a bench trial before an associate judge, this event occurred in early August 2015, days after his birthday. He later testified that the event occurred in mid-September.

removal from his and Mother's custody. In later testimony before the associate judge and in testimony at a de novo hearing before the trial court, Father stated that when he arrived at the Bowie house at night on September 10, he met Mother in the garage and did not go inside the house or see the children.

In any event, while Father was at the house on that occasion, when he attempted to hang a tire swing from a tree, he fell and broke a couple of ribs. According to his testimony, the responding ambulance driver talked with Mother while standing near the front door and while the front door was open, signifying that the driver could have viewed the conditions inside the home at that time. According to Father's testimony, upon his release from the hospital, he returned to the Bowie house but did not go inside, briefly spoke to Sarah but did not see any of the other children, and left. He travled to work in Louisiana. According to him, while he lived and worked there, he called Mother and the children each night. He testified that he had no reason to have concerns about Mother's or the children's well-being at that time.

**The children's September 2015 removal**

In late September 2015, James Gibbs, a CPS investigator, received a referral form the Bowie Police Department about conditions at the Bowie home and went there. He saw that the children were there alone; a child told him that Mother had gone to a doctor's appointment. Gibbs noticed that along with the children being left alone in the home, the home was filthy, and the children looked dirty and unhealthy.

Andrew was wearing a diaper that was "saturated" with urine and feces, and his penis and testicles were "completely covered" in feces. Jackson appeared to be malnourished and fragile; his ribs and vertebrae were visible through his skin, and to Gibbs, he did not appear to be three to four months old. Gibbs saw prescription pill bottles within the children's reach in different parts of the house, and he also noticed that the master bathroom and bedroom were flooded and had standing water within them. CPS arranged for Jackson to go to a hospital's emergency room. When Mother arrived at the house, she became belligerent with the police, and she was promptly arrested.

Upon Jackson's arrival at the hospital, he was diagnosed with failure to thrive, and his condition was near fatal. While Jackson was at the hospital, Gibbs took the other children to the CPS office. According to Gibbs's recollection, while Sarah was at the office, she never asked about the Mother's or Father's whereabouts. She ate food and asked whether she could keep some food to eat later, which Gibbs found to be abnormal for a four-year-old child and indicative that Sarah was malnourished.

Gibbs spoke to Mother while she was in jail. She told him that she had been depressed and that she had a prior mental health diagnosis. Mother called Father from jail. She told him that she had left the children alone to run an errand and that when she had returned, the police and CPS were there, and an officer had arrested her for abandoning the children.

Father returned to Texas and went to the house. He noticed that the house was filthy. He also spoke with Gibbs. According to Gibbs, Father told him that he had seen the children about ten days before their removal. Gibbs recalled Father saying that before Jackson's removal, Father had noticed that he was thin, but Mother had told him that Jackson was not eating well and that all of the children had been sick.

According to Gibbs, Father told him that the conditions of the home were much worse than the last time he had visited Mother and the children there. Gibbs testified that Father told him that Mother had been depressed since Jackson's birth and had been putting on a "mask of happiness."[3] To Gibbs, Father did not appear to be concerned about the children's physical well-being. More specifically, Gibbs observed that Father lacked concern about Jackson's physical condition. Gibbs explained that he "would have expected [Father] to be more concerned with [Jackson's] size."

A grand jury later indicted Father for offenses related to the children's injuries.[4] Father was arrested in December 2015. His charges remained pending at the time of the trial of this case.

---

[3]According to Father's testimony at the de novo hearing, Mother suffered from depression after Jackson's birth. Before the associate judge, however, Father testified that he did not know of any of Mother's mental health problems.

[4]Mother also faced criminal prosecution as a result of the circumstances leading to the children's removal, but she was not convicted because she was found to be insane at the time of the offense. Her mental health issues required a stay in a mental health hospital.

**The Department's termination petition and its temporary managing conservatorship of the children**

Following the children's removal, the Department of Family and Protective Services (the Department) filed a petition seeking termination of Father's rights to the children if their reunification with him could not be achieved.[5] The Department attached an affidavit by Gibbs to its petition. Gibbs swore that upon his arrival at the home, he had smelled an odor of feces. He swore that he had "immediately observed" that Jackson's condition was "consistent with symptoms of failure to thrive"—he had loose skin and a sunken-in face. He also swore that he had seen unsanitary or unsafe conditions throughout the home, including that the floor of the home was "covered in one form of trash, debris, clothes[,] or feces."

Soon after the Department filed its petition, the trial court signed an ex parte order naming the Department as the children's temporary sole managing conservator. At an October 2015 adversary hearing,[6] in conflict with his later testimony, Father testified that he had seen the children the weekend before their removal. In an order

---

[5]The Department also sought termination of Mother's parental rights to the children. Mother eventually signed affidavits in which she voluntarily relinquished her parental rights to the children. The trial court terminated her parental rights to all of the children, and she has not appealed.

[6]*See* Tex. Fam. Code Ann. § 262.201 (West Supp. 2018). Gibbs and Father testified at the hearing. Father testified that he did not know whether Mother had abandoned or endangered the children. He testified that he was not going to "say something to make [his] wife look bad." Mother also testified and invoked her Fifth Amendment right against compelled self-incrimination to most of the questions asked of her.

following the adversary hearing, the trial court continued the Department's appointment as the children's temporary managing conservator. In the same order, the trial court required Father to participate in several services, including a psychological evaluation, counseling, and parenting classes. The trial court also ordered Father to "obtain and maintain legal employment." Sarah Graham, a CPS employee, became Father's caseworker.

**Father's visits with the children, the children's placement in foster care and their development there, Father's service plan, and CPS's interactions with Father**

Following the children's removal, Father first visited them in October 2015. According to his testimony, the children were happy to see him, and when the visit ended, Sarah and Adrianna screamed for him to not leave. But Father did not visit the children consistently thereafter. From October 2015 until February 2017, Father missed about fourteen visits with the children; in other words, he missed visits with the children over forty percent of the occasions they were scheduled.

According to Father's testimony, for part of the Department's case, he did not visit the children because he did not have an automobile or a valid driver's license (his license had been suspended because of unpaid tickets), and he therefore could not drive to see them. He explained that later during the Department's case, he missed visits because he was sick or because of employment conflicts. Father also conceded that he was late to visits with the children about six times; he denied that he ever left visits early.

Tiffany Atwell, who eventually replaced Graham as the caseworker, explained that there were "several times that the children were at the visit waiting for [Father] to show up" and that Adrianna would ask whether she was going to "see[] her daddy." Father last visited the children in January 2017.

The children began living in foster care. They resided in multiple homes during the case. At one point while all four children were living together, Adrianna put her mouth on Andrew's penis.[7] Near that time, the Department split the children into two foster homes; Sarah and Adrianna began staying together in one home while Andrew and Jackson began staying together in another home. According to Atwell, while the Department does not prefer to split siblings into different homes, sexual acts between children justify doing so. Atwell noticed that the children's behavior in foster care improved once they were split into two homes.

According to Atwell, Sarah and Adrianna became "[v]ery bonded" with their foster parents. During the Department's case, Sarah received counseling because of, in part, dreams that she had about Mother. Adrianna participated in play therapy

---

[7]Cheryl Reeves, a case supervisor for Court Appointed Special Advocates (CASA), became concerned about whether Adrianna had been sexually abused because at a visitation, when Father asked her to sit on his lap, she said, "Okay, but don't touch my bo-bo." Reeves never saw Father ask either of the boys to sit in his lap. Reeves also saw that Father would often try to force Sarah to sit on his lap, which Reeves found to be inappropriate. During a visit at a restaurant, Reeves noticed that Sarah was uncomfortable around Father and was not affectionate toward him. Father testified that his physical affection toward Sarah was not inappropriate and that he was excited to see her. Other than this evidence that might raise a suspicion of sexual abuse, we have not located evidence substantiating sexual abuse by Father against the children.

during the Department's case and took medicine to help her sleep. Andrew progressed well in the Department's care; he did not have developmental delays, did not develop special needs, and did not participate in counseling. Although Jackson's condition when he came into the Department's custody was poor, he improved after his removal. He was developmentally on-target at the time of the trial before the associate judge.

The Department filed a service plan. Father received the service plan, which required him to participate in counseling, take a psychological evaluation, complete parenting classes, maintain employment and suitable housing, complete a drug and alcohol evaluation, and take drug tests upon request, among other tasks. In March 2016, CASA filed a report stating that Father had not completed any of his services. The next month, the Department filed a document explaining that Father had quit his full-time job and had obtained a part-time job, that he had not completed services, and that the Department was concerned that he had not "demonstrated his understanding of what it mean[t] to act as a protective parent to the children."

Father attributed his lack of early success in completing services to his inability to go to them—he did not have a valid driver's license. He paid off his tickets and regained his driver's license in early 2016. He testified that after he regained a valid license, he worked diligently on completing the services.

Samantha Kelly, a conservatorship supervisor for the Department, contacted Father in early 2016, and he told her that he was willing to complete services. He

completed FOCUS[8] Fatherhood, a class intended to teach fathers "the important role that they have in their kids' lives." He also completed more parenting classes and other services, and Kelly believed that he took them seriously. She later explained, "He would speak to me about things he had learned . . . . He talked about the ways that it helped him understand what he can and can't control and who he can and can't control." She conceded, however, that she could not assess whether Father applied what he had learned in the classes because, in part, she never watched his visits with the children.

Father began living with his parents. His decision to reside there resulted in him being far away from the children's placements. Kelly frequently visited Father when he was living at his parents' home, and she deemed that home as appropriate for children. She noticed that the home was clean and prepared for the arrival of children, and she found nothing that would present a safety concern for the children. Kelly became concerned, however, when she learned that Father continued to maintain contact with Mother while acknowledging the danger that she had put the children in.[9] Father was "polite and responsive" toward Kelly. They maintained

---

[8]"FOCUS" is an acronym for "Fathers Offering Children Unfailing Support."

[9]About a year after the children's removal, Father filed for divorce from Mother. In January 2018, a trial court dismissed his divorce petition for want of prosecution. Father later testified that any continued contact with Mother during the Department's case was upon her initiation and was unwelcome. He also testified that during the Department's case, he informed the Department that he was in an intimate

regular contact. Father never acknowledged to Kelly that he had fault in the circumstances that led to the children's removal.

In a June 2016 permanency report, the Department informed the trial court that Father had completed his psychological evaluation, had finished his original counseling sessions and had started additional counseling, and had completed parenting classes. The Department stated, however, that Father had only sporadically visited the children and that he had not accepted responsibility for the children's circumstances leading to the Department's involvement. The Department also informed the trial court that Father had tested negative on a random drug test.

**Father's February 2017 automobile accident, his resulting memory loss, and the end of his interactions with the children**

In February 2017, Father sustained serious injuries from a one-car automobile accident. He testified that while driving to visit the children, he became unconscious, drove across oncoming traffic, and slammed into a ditch. His father's car flipped four times, and as he was not wearing a seatbelt, he was ejected from the vehicle. According to Atwell, Father told her that he had been speeding at ninety miles an hour before he lost control and wrecked.

Father's injuries resulted in his loss of consciousness for two or three days and required him to stay in a hospital for one to two weeks. During Father's hospital stay, Mother spent a significant amount of time with him. Her doing so concerned Reeves

relationship with someone and that he did not want the Department to know who the relationship was with because he did not want the Department to contact that person.

14

because Reeves was "under the impression that [Father and Mother] were not together, and [Father] had placed the blame of the removal on [Mother]." Medical records generated during Father's hospital stay stated that he had been consuming fifteen shots of liquor per week. After his release from the hospital, Father began receiving disability benefits resulting from limitations caused by his broken back and his broken pelvis.

According to Father, his accident resulted in significant memory loss. He testified that part of his brain had died and that it would not "grow back." After his release from the hospital, Grandmother helped care for him. She noticed that the medicines Father took "made him a different person." She also noticed his memory loss—he did not know who she was or who the children were for three or four weeks following his release from the hospital. Eventually, Grandmother believed that Father remembered her and the children,[10] and he expressed to her that he missed the children, wanted to see them, and wanted for them to come home.

About three months after the collision, Father told Kelly that he had suffered memory loss and that he was "struggling to remember the past few months." She noticed that he was wearing a back brace, and he told her that he was taking several medications to reduce pain. Father continued to miss visits with the children while

---

[10]On cross-examination in the trial before the associate judge, Grandmother testified that she was not aware that Father had testified earlier that he had accepted who Grandmother was but that he did not remember her. She also testified that she was unaware of Father's testimony that he had limited memories of the children and that he did not expect his memory problems to improve.

recovering from his injuries. He testified that after the accident, he was "cut off" from the children—he did not see them or speak to them after that time.

**Trial before the associate judge**

The Department eventually changed its goal from reunifying Father with the children to terminating his parental rights. Through a series of hearings occurring from December 2017 through April 2018, the parties initially tried the case before an associate judge.[11]

Father's memory loss impacted his testimony. Before the associate judge, he testified that he did not remember who Gibbs was. He acknowledged that medical records provided that he had taken Mother to a hospital in Bowie in late July 2015, but he testified that he did not remember doing so. He testified that he did not know who his mother was, stating, "I've accepted who she is, but I don't remember her." At one hearing when he was asked what month it was, he said he had no idea, and when he was asked who the president was, he said, "Obama--Trump."

When asked what he remembered about Jackson, Father testified, "Nothing." He testified that he remembered only "bits and pieces" of his interactions with the children. He testified that his limited memories of the children were positive; the children were "happy in them." At one point in his testimony, he stated that he did not recall missing visits with the children. Father testified before the associate judge that because of his memory impairment, he did not remember Mother being his wife

_____

[11]*See* Tex. Fam. Code Ann. §§ 201.001–.018 (West 2014 & Supp. 2018).

or being in love with Mother, but he did "remember that she was a part of [his] life." Father's testimony indicated that he did not know some of the children's birthdays, nor did he know what school grades they were in. He testified, "I don't remember being a father." He said that he had not seen a physician about his memory loss.

While Grandmother's testimony at the time of the trial before the associate judge establishes that Father was still suffering from memory loss at that time, she stated that his memory was much better than upon his release from the hospital. Father asserted that his memory issues did not impair him to the point where he could not care for the children.

When the Department's attorney showed Father photographs of the Bowie home's conditions upon the children's removal, he agreed that those conditions had endangered the children. He also agreed that Mother should not have left the children alone at the home. He conceded that Jackson did not look healthy upon his removal. He also acknowledged that Andrew, whose penis was red and had feces on it at the time of his removal, did not look healthy.

Father testified that near the time of the children's removal, he was not living with them because he was working out of town. He explained that at that time, he had talked to the children every night and had sent them money. He testified that the last time he was inside the children's home before their removal was the beginning of August 2015, more than a month prior. He also testified that he last saw them before their removal in late July 2015, when they visited him for his birthday. According to

17

Father, at that time, "all the kids were fine." Father testified before the associate judge that he did not remember earlier testifying that he had seen the children the weekend before their removal and that he had changed some of the children's diapers at that time without noticing anything that concerned him about their health. He further averred that he did not remember previously testifying that he knew before the time of the children's removal that Jackson weighed less at that time than at his birth. He indicated that his testimony at the adversary hearing was not reliable because he was "frantic" and "hectic" at that time.[12]

Concerning what he should have done to avoid the children's removal, Father testified, "I should have brought my whole family with me [to the city where he was working]. . . . I shouldn't have left them there." He testified that he did not know of the children's medical needs or that Mother was not meeting them because he was "busy working. We were in the process of losing our house. . . . I was trusting [Mother] to take care of [the children]." Before the associate judge, when Father's counsel asked him why he believed that he had never abandoned the children, he testified,

> Because I was . . . never intending on being gone. . . . There was never an intention of me to just leave them. All I was doing was trying to work and get a stable place back around our family . . . . That's what I was trying to do. I never intended to leave Bowie because I was trying to leave the kids, or because I didn't like the town, or anything like that. I was just trying to get back home with everybody.

---

[12]Later at the de novo trial, Father testified that his anxiety at the adversary hearing had affected his ability to accurately recall facts.

Father further testified that he had always provided for the children, that he had a strong bond with them, and that he had enjoyed spending time with them.

Father testified that he did not deserve termination of his parental rights because the "worst thing [he] did was worry about getting bills paid and making money." He said that he had no idea that Mother would allow the conditions of the home and of the children to deteriorate in the manner that they did. He testified, "I didn't think she was going to sit there and leave the kids alone for hours, or do anything like that. That was not a thought in my mind." He repeatedly testified that he had no knowledge of the circumstances leading to the children's removal and stated, "I mean, when I was living with them, [Mother] always made tea, she always had dinner ready, everything was [fine.]"

Contradicting the data in records from his hospital stay, Father testified before the associate judge that the last time he drank alcohol was when he was nineteen years old. He testified that he did not recall discussing drinking alcohol with anyone at the hospital. He averred that he does not have an alcohol problem, that he has never had one, and that he did not know why hospital records stated that he had a problem with alcohol abuse. He conceded that he had used marijuana and methamphetamine while he was in high school but stated that he had not used illegal drugs since then.[13] S.H.

_____

[13]Father tested negative on random drug tests that Kelly administered; she never tested Father to determine whether he had drunk alcohol.

19

(Stacy), Grandmother's sister, testified that she saw Father on a regular basis and never saw him with alcohol.

Regarding his future plans for the children, Father testified before the associate judge,

> I could stay living with my parents, and then I could get the kids in there, and I would have my support group right there. I would have my mom, [she] would leave her job, I would pick up a job that would pay a little bit more, and then I could come home every night. I wouldn't pick another job that sent me away like these last ones did.

The associate judge found that the Department proved grounds for termination and signed an order terminating Father's parental rights to the children. Father filed a request for a de novo trial before the trial court.[14]

**Trial de novo**

At the de novo trial, Father again testified that the last time he saw all of the children before their removal was at the beginning of August 2015, a month before their removal. Before the trial court, Father testified that when he visited home in September 2015, about two weeks before the children's removal, he saw Mother when he attempted to install a swing on a tree. After he saw her, but without seeing the children and while attempting to surprise them, he climbed the tree, fell from it, sustained injuries, and went to the hospital. According to Father's testimony at the de novo trial, on that occasion, he never went inside the house, so he did not smell any odor emanating from inside the house. He looked inside the living room, but it

---

[14]*See* Tex. Fam. Code Ann. § 201.015.

"wasn't that bad" and was not representative of the conditions that Gibbs found two weeks later. According to Father, after his release from the hospital, he did not go into the house, and although he saw Sarah, he did not see the other children.[15] After the day he saw Sarah, Father did not see any of the children again until October 2015, at his first visitation after their removal. Father recognized that his testimony regarding some of these matters at the de novo hearing conflicted with his testimony before the associate judge. He also recognized that the testimony conflicted with his testimony at the adversary hearing, when he said that he saw all of the children the weekend before their removal.

Father testified before the trial court that his automobile collision had impacted his memory but that his memory was improving. He said, "I'm starting to remember memories from when I was a child and up through recently. . . . I understand my memories now. I actually remember them . . . ." Father testified that at the time of the de novo hearing, he was seeing a psychiatrist for issues related to his memory loss, and he opined that he remembered between ninety and one hundred percent of pre-accident facts.

Father acknowledged that he was receiving over $1,000 in disability benefits, which he used to make a car payment and to pay rent to his parents, among other expenses. But he averred that he was ready for employment and that physically and

---

[15]At one hearing in front of the associate judge, Father testified that he had "talked to the kids" when he had visited the house to hang the swing.

mentally, he was prepared to support and manage four children. Father acknowledged that he had a history of battling anxiety, but he testified that as of the time of the de novo hearing, his anxiety issues had been resolved. He described anxiety as a "worthless emotion."

After reviewing the evidence admitted before the associate judge and after considering new evidence, the trial court likewise found that the Department had proved statutory grounds for termination[16] and that termination was in the children's best interest, and the court terminated Father's parental rights. Father brought this appeal.

## The Trial Court's Best-Interest Finding

In his only issue on appeal, Father contends that the evidence is legally and factually insufficient to support the trial court's finding that termination of his parental rights is in the children's best interest.

### Standard of review and applicable law

When the State seeks to sever the relationship between a parent and a child, it must first observe fundamentally fair procedures. *In re E.R.*, 385 S.W.3d 552, 554

---

[16]The court found that Father had knowingly placed the children in conditions or surroundings that endangered their physical or emotional well-being, had engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the children's physical or emotional well-being, had constructively abandoned the children, and had failed to comply with provisions of a court order that established acts necessary for him to obtain the children's return after they had been removed for abuse or neglect. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (N), (O) (West Supp. 2018). Father does not challenge these findings.

(Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)). Thus, we strictly scrutinize termination proceedings in favor of the parent. *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012); *E.R.*, 385 S.W.3d at 554–55.

Termination decisions must be supported by clear and convincing evidence. *See* Tex. Fam. Code Ann. §§ 161.001(b), .206(a) (West 2014); *E.N.C.*, 384 S.W.3d at 802. Due process demands this heightened standard because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'" *E.R.*, 385 S.W.3d at 555 (quoting *Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2014); *E.N.C.*, 384 S.W.3d at 802.

For a trial court to terminate a parent-child relationship, the Department must establish by clear and convincing evidence that the parent's actions satisfy one ground listed in family code section 161.001(b)(1) and that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001(b); *E.N.C.*, 384 S.W.3d at 803.

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the Department proved the challenged ground for termination. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We

disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.*

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses because that is the factfinder's province. *Id.* When credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* The factfinder is free to accept or reject all or part of the testimony of any witness. *See In re L.B.*, No. 10-17-00279-CV, 2018 WL 1415736, at *2 (Tex. App.—Waco Mar. 21, 2018, pet. denied) (mem. op) (citing *In re C.E.S.*, 400 S.W.3d 187, 195 (Tex. App.—El Paso 2013, no pet.)).

We are required to perform "an exacting review of the entire record" in determining whether the evidence is factually sufficient to support the termination of a parent-child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief of the challenged grounds for termination. *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or

conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

We review the entire record to determine the child's best interest. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). We generally presume that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Nonexclusive factors that a factfinder may use in determining the best interest of the child include the desires of the child, the emotional and physical needs of the child now and in the future, the emotional and physical danger to the child now and in the future, the parental abilities of the individuals seeking custody, the programs available to assist these individuals to promote the best interest of the child, the plans for the child by these individuals or by the agency seeking custody, the stability of the home or proposed placement, the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one, and any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best interest finding, "we consider, among other evidence, the *Holley* factors").

**Father's acts and omissions that reflect on his parental abilities and his ability to meet the children's needs and to provide them with stability**

Much of the evidence presented in the trial court concerned the conditions of the children and of their home upon removal and whether Father bore responsibility for those conditions. On appeal, Father states that the children's removal was caused

by Mother leaving them "unattended and in poor physical and living conditions." He asserts that he was working out of town, that he knew nothing about the conditions, and that his "wife failed to [properly] care and provide for [the] children."[17]

The trial court, however, could have rationally found that Father, through his acts or failures to act, bore fault in the conditions that endangered the children and that threatened Jackson's life. In Father's initial testimony about the events leading to the children's removal, which he gave prior to his car accident resulting in memory loss, he stated that he saw the children the weekend before their removal. He later testified that he last saw them at the beginning of August 2015, almost two months before their removal. The trial court had the authority to accept Father's initial testimony and Gibbs's recollection that Father told him he had seen the children recently before their removal and reject Father's later, contradicting testimony.[18] *See L.B.*, 2018 WL 1415736, at *2. If it did so, the trial court could have reasonably found that Father should have taken some action to address Jackson's health. Upon his

---

[17]Similar to Father's assertions on appeal, Reeves overheard a conversation in which Father said that he had no responsibility for the circumstances leading to the children's removal because he had been out of town and had been unaware of the conditions of the children or their home. Reeves averred that Father "basically laid the blame . . . on [Mother]."

[18]When the children's attorney ad litem asked Father how the court was supposed to resolve the conflicts in his testimony and discern the truth, he responded, "I don't know."

removal a week later, Jackson was patently malnourished;[19] he weighed less than eight pounds (after weighing between seven and eight pounds upon his birth months earlier), his ribs and vertebrae were visible, he had sunken eyes, and he did not look his nearly-four-month age. His condition required hospitalization; he was diagnosed with failure to thrive, and it was nearly fatal. A doctor wrote a note stating that he deemed Jackson's return to the "environment he was in" unsafe and that Jackson was in a "life and death situation." Father testified that he never noticed that Jackson was losing weight after his birth. But the trial court could have reasonably found that Father should have been more active in monitoring Jackson's condition given Adrianna's prior diagnosis of failure to thrive.[20] CPS also arranged for Andrew and Adrianna to have medical evaluations after their removal. Records from those evaluations state that Andrew had been neglected and that he "grabbed for [a] bottle urgently" and that Adrianna grabbed food out of a nurse's hand. From this evidence, the trial court could have reasonably determined that Father bore fault in failing to notice or to remedy the children's deteriorating conditions.

---

[19]Medical records state that Jackson was "EXTREMELY EMACIATED" and "very frail" upon admission and was still at his birth weight. His treatment plan included "AGGRESSIVE FEEDING." The records further state that at the hospital, Jackson gained weight, including gaining ten ounces on his last night in the hospital, and became more interactive.

[20]Medical records related to that diagnosis state that Adrianna appeared "wasted."

Further, Father testified before the associate judge and before the trial court that he had traveled to the Bowie home on September 10, 2015, two weeks before the children's removal. Although Father testified before the associate judge that he had met Mother in the garage, had smoked cigarettes with her there, and did not recall entering the house, the trial court could have reasonably doubted that testimony.[21] Further, the trial court could have reasonably held Father responsible for the endangering conditions of the home given that CPS had previously intervened because of, in part, the children's cluttered home. Because of Father's admitted presence at the home two weeks before the children's removal and because of his knowledge that Mother had a history of failing to maintain a clean home in his absence, the trial court could have reasonably found that he had responsibility to prevent or remedy the conditions of the home that Gibbs discovered in September 2015.

In his testimony, Father attributed some of the conditions of the home upon the children's removal to a family dog that normally stayed outside but had been let into the house. Near the time of a visit with Sarah, he wrote, "She told me that it was all her fault. It was all her fault for letting the dog in when [Mother] left." But Gibbs

---

[21]The Department urged the trial court to reject Father's testimony that he did not enter the house, arguing in the de novo hearing: "[Father] wants this Court to believe that this great father [who] hasn't seen . . . his children in a month . . . doesn't see the children, he just goes and builds a swing, even though his first story to the child protection court was I saw all of the children and I went in the house."

testified that he did not recall the presence of a dog at the house or the children talking about a dog when he went to the house at the time of the children's removal.

Longer before the events leading to the children's removal, Father did not appear to prioritize his involvement in their medical care or his awareness of the circumstances leading to that care. For example, medical records from Jackson's birth show that he remained in the hospital after Mother's discharge because she had used opiates during her pregnancy, and Jackson needed monitoring for possible withdrawal. But at the trial before the trial court, when Father claimed he had regained much of his memory, he denied that upon Jackson's birth, Jackson had an extended stay in the hospital because of possible opiate withdrawal. Similarly, before the associate judge, Father testified that he did not remember being told that the hospital was delaying Jackson's release because of the drug withdrawal, but he said that if the hospital records indicated such a delay for that reason, he did not "know how [he] could debate that." Further, at one point, Father testified that he only took one child—Sarah—to the doctor on one occasion; he never took any of the other children to the doctor. Later in the same hearing, he testified that he took Adrianna to the doctor on a few occasions but that he did not take the children to the doctor regularly because he "was typically working."

Next, the trial court could have relied on Father's acts and omissions following the children's removal to determine that he lacked abilities to properly parent them, to meet their needs, and to provide them stability. As explained above, Father missed

29

many visits with the children and was late to others. And the trial court could have further found from the visits Father attended that he lacked the abilities to properly parent the children and to provide for them. For example, Atwell testified that notes she received from Father's visits with the children indicated that he had raised his voice at them frequently. She explained that when she had asked Father whether he had raised his voice at the children, he had said, "I guess trying to get four children to listen can be overwhelming." Atwell further explained,

> I observed several visits where he would become frustrated with, mainly [Sarah] and [Adrianna], because they [were] mobile. You know, they would kind of like to hang on him, are super excited to see him, and he would . . . raise his voice at them and tell them to stop and get down . . . .

Atwell also stated that Father did not give equal time to the children; he spent more time with Sarah and had a deeper relationship with her as compared to the other children.

From the time that Atwell became the children's caseworker, Father did not send letters or cards to the children, and he requested to speak with the children by phone only once. Atwell testified that during several phone calls she had with Father between March 2017 and October 2017, he never asked how the children were doing, never asked for photographs of the children, and never asked to see them.

Reeves watched many of Father's visits with the children after their removal; she also observed that he did not attend many of the visits that the Department set up for him and that he left early or arrived late at other visits. On the visits that Father

30

attended, Reeves noticed that Father generally acted within the visitation rules but that he did not always interact with all four children, that he interacted with the girls more than the boys, and that he did not appear to bond with all the children. Reeves explained that several times in visitation, "it seemed more like going through the motions[ and] that [Father] wasn't fully engaged with the children." Reeves also noticed that "a couple of times[, Father] seemed like he was going to lose his temper" with the children.

Finally, the trial court received conflicting evidence concerning whether Father has a problem with alcohol abuse. His medical records from his auto accident state that he does. They show that he was placed on a protocol related to alcohol withdrawal and that he had a history of alcoholism. One record states that he drank alcohol every week. Another record states that along with smoking a pack of cigarettes a day, he drank fifteen shots of liquor per week. Consistent with these medical-record references, the record of the trial before the associate judge contains references to a psychological evaluation in which Father told the examiner that after he lost a job in the oil field, he drank vodka to help him sleep. Father testified that he and Mother used "Bud Light" as a code word to describe money that Mother's family was giving to him to bail her out. He also testified that he used "vodka" as a slang word for money.

Nonetheless, Father denied having a history of alcohol abuse and testified that he last drank alcohol when he was nineteen years old. Before the trial court, he

appeared to blame Mother for the references relating to his alcohol use in his medical records. Bob Robinson, a former pastor who manages the ten-week FOCUS Fatherhood program that CPS contracts with, testified that Father did not discuss any substance-abuse issues during his FOCUS Fatherhood classes, but he also testified that he could not "discount[] the fact that some people can hide their addiction[s]." Kelly testified that when she visited Father's parents' house, she never found alcohol. She stated that she was never concerned about Father drinking alcohol. But Kelly testified that if she had known about the references to Father's alcohol consumption in his medical records, she would have changed how carefully she would have searched for alcohol in his parents' home. She also acknowledged that "there are people who are good at hiding things." Clinton Bratcher, a hospital chaplain and Father's former pastor, testified that Father never disclosed a substance-abuse issue to him and that Bratcher was certain that Father would have disclosed such an issue if one had existed.

If the trial court credited the evidence in Father's medical records relating to his consumption of alcohol and discredited the contradicting evidence, including his testimony, it could have rationally considered his alcohol abuse in its best-interest determination. Reeves testified that if Father had a problem abusing alcohol and never disclosed the problem during the case, she would be concerned because "a child could be returned to a parent with a current alcohol problem who is not seeking treatment. And parents under the influence of substances tend to be neglectful." She further

32

testified, "It's very concerning that [the alcohol abuse] would have stayed hidden[.] . . . [W]hen children come into care, the parents are offered certain services that the Department is willing to pay for. Counseling, if there is an issue with substance abuse, they are offered help with that, too. So not seeking that would be very concerning."

From all of this evidence relating to facts before and after the children's removal, the trial court could have reasonably determined that Father had endangered the children, had failed to prioritize them, that he was not nurturing to them, and that he lacked abilities to properly parent them and to provide for their physical and emotional needs. *See Holley*, 544 S.W.3d at 372.

**Programs that were available to Father and whether he benefited from them**

The Department offered services to Father that were designed to assist in reuniting him with the children. Although the trial court received evidence showing that Father completed many technical requirements of these services, the court also received evidence showing that he failed to complete some services and that he failed to apply lessons that he learned in services he completed.

At trial before the associate judge, the Department, through Atwell's testimony among other evidence, took the position that Father had not complied with the service plan in the sense that he had not demonstrated behaviors consistent with what he had learned in classes or consistent with recommendations from service providers. For example, the service plan required Father to maintain a safe, stable, and suitable home for the children. Atwell testified that Father had failed to meet this requirement

because for much of the case, he had lived with his parents, whom the Department did not consider appropriate caregivers for the children.[22] Next, the service plan required Father to compete a budget; Atwell testified that he never did so. The service plan also required Father to maintain income capable of supporting his children; Atwell testified that he did not do so because, in part, he quit his job to complete other requirements of the service plan.[23] Atwell testified that the service plan required Father to inform the Department about changes of his address within three days of the changes and that he had not done so. Finally, Atwell testified that although Father had completed parenting classes, he had not demonstrated the knowledge that he gained through those classes during his visits with the children, as indicated from the visitation facts summarized above.[24]

Although Reeves acknowledged that Father eventually completed services, she expressed concern about his minimal progress on the services toward the beginning of the Department's case, stating, "[W]hen services haven't been completed and the case has been going on for six months, that is concerning . . . because it does not

---

[22]Atwell explained that the Department conducted a home study on Father's parents and that following the home study, the Department disapproved of the children residing there. We have not located evidence establishing why the Department disapproved of the children residing with Father's parents.

[23]Reeves testified that in many cases she worked on while at CASA, a parent was able to complete services while maintaining a full-time job.

[24]Kelly testified that a parent's interaction with a child shows how well the parent is able to apply lessons taught in parenting classes. She explained that she had never observed any of Father's visits with the children.

indicate that the parent is motivated enough to get [his] child back to have made the necessary appointments and steps . . . ." Reeves testified that when the Department assigned the services to Father, the Department informed him to "complete them as soon as possible." She also expressed concern that Father lacked stable housing and consistent employment during the Department's case. Finally, she expressed concern that although Father had completed counseling and parenting classes, he had never accepted responsibility for the conditions leading to the children's removal and had never shown remorse about them.

Robinson testified that Father graduated from the FOCUS Fatherhood program in 2016. He described Father as an "outstanding student." He testified that Father was "very thoughtful in his paperwork," attended every session, and was active in discussions. Robinson opined that Father "seemed to be grasping what we were teaching." During his testimony, Robinson discussed several documents that Father completed during classes and explained how they indicated Father's thoughtful, serious, and meaningful participation in the program. Robinson testified, "It was pretty clear that he was internalizing [the] material . . . ." He explained, "I . . . saw that he took to heart some of these tools . . . and that he really was sincere in his willingness to be the kind of father [the children] need him to be."

Robinson conceded, however, the he could not opine about whether Father would raise the children according to the lessons he had learned in the program, and Robinson testified that he had no insight about how Father had used the tools learned

in the program during visits with the children. He also acknowledged that he could not recall Father revealing the circumstances leading to the children's removal. When the Department's attorney showed Robinson photographs of the children's home upon their removal, he acknowledged that the photographs were appalling. Robinson also admitted that Father's change of testimony about when he last saw the children before their removal indicated that he may not have been taking responsibility for their removal.

Balancing this evidence, the trial court could have rationally determined that Father's technical compliance with parts of his service plan did not weigh in favor of returning the children to his care because he failed to comply with other parts of the service plan and because he did not demonstrate that he had benefited from the services. And the trial court could have likewise determined that the children's best interest would not support delaying the provision of a permanent home for the children while Father engaged in further services intended to assist his reunification with them. *See id.*; *see also In re A.B.*, 412 S.W.3d 588, 601 (Tex. App.—Fort Worth 2013) (en banc op. on reh'g) (explaining that "[p]rompt and permanent placement of the child in a safe environment is . . . presumed to be in the child's best interest"), *aff'd*, 437 S.W.3d 498 (Tex. 2014).

**The children's desires, Father's and the Department's plans for them, and the stability of the Department's proposed placements**

The Department's plan for the children upon termination of Father's rights was to allow them to be adopted by their foster families. Reeves testified that the children were thriving in their foster placements. She testified that they enjoyed the environments where they were living and that they were bonded with their foster families. Jackson, who had previously been diagnosed with failure to thrive, regained health with his foster family; Reeves saw him playing, running, and talking. Sarah, who had a withdrawn and quiet demeanor upon removal, became a "giggly, bubbly girl" and grew physically. Adrianna, who was "barely talking" at the time of the removal, blossomed and became outgoing in her foster placement. The girls told Reeves that they wanted to permanently stay with their foster parents, to whom they referred as "mommy and daddy." According to Reeves, although the boys and girls live with separate foster families, their foster families provide opportunities for all four children to see each other. Reeves opined that termination of Father's rights was in the children's best interest.

Atwell explained that each foster home wanted to adopt the children who lived there. She said that the four children saw each other regularly and that she did not have any reason to believe that they would stop doing so. Neither Sarah nor Adrianna ever told Atwell that they wanted to return to Father's or Mother's care. Atwell

expressed her belief that although Sarah remembered Father, the other three children did not.

When the Department's attorney asked Father about his plans for the children if the court returned them to him, he said that he planned to take part-time courses in endocrinology "or something of that nature," work to support the children, and have them live with him and his parents (at his parents' house) and "be happy." He said that if the children lived at his parents' house, Grandmother would quit her job—an office manager for a dentist—so that she could supervise the children when Father was away. He testified that he enjoyed spending time with his children, including taking them on outdoor excursions, and that he wanted them back.

Grandmother resides in a two-story, 2700 square-feet, four-bedroom home. She testified that she has an excellent relationship with the children and that she loves them. She explained that she had watched them often at her house over weekends while Mother and Father worked and that she and Father's father had taken care of them "very well."

Grandmother testified that if the children lived with her, she would keep her house clean and provide for their needs, including food. She stated that if the children lived with her, she would ensure that they would not be endangered. When Father's attorney asked Grandmother why the trial court's return of the children to Father's care so that they could live in her home would be in their best interest, she replied,

"Because we're family. . . . Because we stick together. . . . My life is not complete without them."

The trial court, however, could have reasonably found that allowing the children to live with Grandmother would not support their best interest. Like Father, Grandmother declined to hold Father fully responsible for the conditions leading to the children's removal, testifying that she did not because he "wasn't there." The trial court could have also found that Grandmother would not be a proper placement for the children because she had failed to notice and address the children's conditions leading to their removal. Grandmother testified that on occasions when she went to the children's residences before their removal (she visited the Bowie home only once), she did not see anything that concerned her. But she recognized that when she went to the Bowie house after the removal, it was "[e]xtremely filthy." According to Grandmother, during the times when the children were in her possession, she never found a reason to believe that Mother and Father were not adequately providing for them. But as explained above, two of Father's children were diagnosed with failure to thrive, and their conditions upon removal evidenced an apparent lack of provision and care. When Grandmother viewed the photographs of the children and of their home upon their removal, she agreed that they had been endangered and that Jackson had been abused or neglected.

Weighing all of this evidence, the trial court could have rationally found that the children's future well-being if returned to Father's custody and placed in

39

Grandmother's home was uncertain and that the children's best interest favored keeping them in their foster homes, where they had bonded with their foster parents, had thrived, had their emotional and physical needs met, and had opportunities for permanency and stability through adoption. *See Holley*, 544 S.W.2d at 372. The trial court could have reasonably given weight to the evidence that Sarah and Adrianna desired to remain with their foster parents and that returning Andrew and Jackson to Father's care would have taken them away from foster parents, with whom they were bonded, to place them with Father, with whom they had developed a limited and distant relationship. *See id.*; *In re J.P.*, No. 02-18-00117-CV, 2018 WL 3763923, at \*4 (Tex. App.—Fort Worth Aug. 9, 2018, no pet.) (mem. op.) (affirming a trial court's finding that termination was in children's best interest when the evidence "showed a strong bond among the foster family, John, and Jackson and a comparatively weak bond between the children and Mother").

**Witnesses' recommendations**

Several witnesses who had no direct interest in the children's placement provided recommendations about the propriety of termination of Father's parental rights. Navauda Miller, a CASA supervisor, testified that based on her conversations and her consideration of the facts of the case, she believed that the children's best interests supported termination of Father's parental rights. She testified that based on her review of the testimony and exhibits, Father's custody of the children would

40

significantly impair their physical and emotional well-being. Miller based her opinions in part on Father's memory issues, stating,

> Well, . . . there's counseling appointments that need to be kept up with, of course, there's school and school activities, and getting them where they need to go, which only gets more complicated as they get older, and then just, like, I mean, if he can't even remember what day it is, like, how is he going to know where they're supposed to be and what they're supposed to be doing.
>
> . . . .
>
> . . . [I]f you can't tell what's true from day to day, I mean, again what happens, especially as they get older and you're trying to keep up, you know, you're trying to parent kids that, Lord knows, especially when they get to be teenagers, you need to remember what they've told you.

Atwell likewise expressed concern about Father's memory loss. She testified,

> If you can't remember what month it is or what year it is, how are you going to remember appointments for four children, getting them to school on time, or counseling appointments, medical/dental appointments?
>
> . . . .
>
> . . . [I]f you don't know if something happened, or if something happened or didn't happen, say with maybe family members, how are you going to know they're protected if you don't remember them?

Reeves, a CASA supervisor, supported termination of Father's parental rights, basing her recommendation on "pictures . . . of the condition of the home and the children, the condition of the children themselves at the time of removal, and then the [cumulation] of interactions that [she] saw with both [Father] and the foster parents, both sets of foster parents." The children's attorney ad litem likewise supported termination of Father's parental rights, stating in part,

41

When we talk about the emotional and physical needs of the children, not just now but in the future, we don't know what that's going to bring. With all of the information that's in the record, not just the written records, but the prior testimony and then testimony before this Court, there are going to be a lot of stressors with four children.

And one of the things that we could also be concerned about is what is going on with the children not just now, but later, later on. I do believe that while they are not in any imminent danger, [Father's] parenting abilities would be absolutely stretched to the maximum. . . .

. . . .

. . . And everything would be brand-new to [Father] even with the help of his folks.

When we start talking about the stability, while I do believe that [Father] does have support, at some point, these are his children and he is responsible for them. I believe that history has repeated itself more than once in regard to . . . [Father] and that also contributes to our position in regard to the children.

Bratcher, Father's former pastor, testified on Father's behalf. He explained that at some point before the children's removal, he had visited their home and had seen that while the home was not pristine, it was not a "filthy mess." Bratcher described Father as a good and faithful friend. He testified that he and Father had conversations about theology, Father's spiritual life, and relationships. He explained that Father had a good relationship with his children and used humor and a "wonderful wit" in his interaction with them. Bratcher testified that the children loved Father and that he was attentive to them. Bratcher saw Father discipline the children verbally.

Bratcher also testified that Grandmother is "the ultimate mom. She's loving and caring and takes care of her kids, even when they're grown." He supported allowing the children to live with Father at Grandmother's home, explaining,

> [O]ne of [Father's] greatest strengths is his family. They stick together, work together as a team through just about everything that's ever come their way, and it's not always been good. There's been adversity, and they work together. And I think one of the strongest points is the fact that he would have them in that home.
>
> . . . .
>
> . . . I believe the children belong with their family, so there will be an unbroken line, hopefully. And they want it because they are family. This is what [Father's family does]; they take care of family. And I've never heard anything other than, "We want our family, including the kids, together." They make sacrifices, they work together on it, and they're making plans that I consider to be wise plans.

On cross-examination by the Department's attorney, Bratcher admitted that he was unaware of details of CPS's involvement with Father's children, including the diagnoses of failure to thrive with respect to Adrianna and Jackson. Bratcher testified that he was shocked when he saw news reports about the removal of the children and their condition upon the removal. But he testified that he did not believe that Father "knowingly would have allowed his children to be in [those] condition[s]."

Stacy, Grandmother's sister, testified that Father was loving, that he had a "big heart," and that the children loved him. Stacy never saw Father abuse the children in any way. When she saw the children, they were clean and appeared to be well-nourished; she conceded, however, that she had never visited the children's home.

43

She testified, "I feel that [Father] is a good father. He loves his children. This is not on him. . . . He was not at home when this was all happening." But Stacy conceded that she never asked Father about the events leading to the children's removal, and she stated that she should have asked. Stacy also acknowledged that she was not aware of the 2013 CPS investigation or of Adrianna's diagnosis with failure to thrive.

We conclude that the trial court could have rationally accepted the recommendations of the children's attorney ad litem, CASA workers, and the Department's representatives over the recommendations of Father's family and his former pastor, who largely declined to acknowledge Father's responsibility for the children's endangerment and who were less aware of the facts leading to the removal of the children from Father's custody. *See, e.g.*, *In re C.K.*, No. 04-18-00374-CV, 2018 WL 4903047, at *4 (Tex. App.—San Antonio Oct. 10, 2018, pet. denied) (mem. op.) (relying on recommendations of the Department, the children's ad litem, and a CASA volunteer); *In re A.C.*, No. 02-16-00325-CV, 2017 WL 817153, at *6 (Tex. App.—Fort Worth Mar. 2, 2017, no pet.) (mem. op.) (stating that a trial court may rely on an attorney ad litem's best-interest recommendation).

**Summation**

For all of these reasons, we conclude that the trial court, in considering all of the evidence recited above along with the remaining evidence in the record, could have rationally reached a firm conviction or belief that termination of Father's parental rights to the children was in their best interest. *See* Tex. Fam. Code Ann.

44

§ 161.001(b)(2). We therefore hold that the evidence is legally and factually sufficient to prove by clear and convincing evidence that termination of Father's parental rights is in the children's best interest, and we overrule Father's sole issue. *See id.*; *J.P.B.*, 180 S.W.3d at 573; *C.H.*, 89 S.W.3d at 28; *Holley*, 544 S.W.2d at 371–72.

## Conclusion

Having overruled Father's only issue, we affirm the trial court's judgment terminating his parental rights to Sarah, Adrianna, Andrew, and Jackson.

/s/ Wade Birdwell

Wade Birdwell
Justice

Delivered: December 13, 2018